Evans, J.
The action is one on behalf of plaintiff seeking an accounting from the defendant, and is submitted on the pleadings and the evidence.
A consideration of the case has necessarily taken much time, not only because of the voluminous record, and the large number of authorities cited in argument, but, as well, on account of the importance of the case, and the issues involved. It will not be possible to discuss at much length the evidence, or to cite the authorities further than is necessary to a clear understanding of the issues made, as I comprehend them, and the principles of law applicable thereto, and which govern in their determination. The claims made by the plaintiff in its petition are substantially as follows:
1. It claims that in August, 1895, plaintiff leased to a partnership, known as the Maple Hill Coal Company, the right to mine and take the coal from a certain -tract of coal land owned by plaintiff, consisting of about one hundred and eight acres, at a royalty of ten cents per ton, with a minimum annual royalty upon twenty thousand tons, until all of the merchantable coal therein had been mined and removed.
That on July 15, 1902, said lease was in full force and there remained in said,leased land a large amount of coal unmined and unremoved.
That about May 1, 1902, said Maple Hill partnership entered into a contract in writing with plaintiff whereby it agreed to deliver to plaintiff all of the output of coal mined by it from its lands, commencing May 1, 1902, and closing April 30, 1903, at a stipulated price of seventy-eight cents^per ton for coal loaded in open cars, and eighty-eight cents per ton for coal loaded in box cars; that by said contract plaintiff agreed to take during said year, and said partnership *197 agreed to mine and deliver to plaintiff, a minimum of eighty thousand tons of coal from said premises.
That from May 1, 1902, up to about July 15, 1902, said contract was in full force and effect, and was being executed according to its terms.
That plaintiff’s rights in said contract were valuable, and worth to plaintiff a large sum of money.
That at said time the defendant was a director and an officer of plaintiff’s company, and-was in practical charge of plaintiff’s business affairs, and in charge of the sale of its coal output.
That about'July 15, 1902, defendant, conspiring and contriving to cheat and defraud plaintiff, and to acquire to'"himself the rights and privileges belonging to plaintiff under said contract, and the profits arising therefrom, without any consideration and without any authority from plaintiff or its board of directors, and without its knowledge, began negotiations to purchase from said Maple Hill Company all of its coal property, including the rights and privileges granted to it by plaintiff by said lease of 1895, and that ‘he unlawfully and fraudulently, and in violation of his duties and trust as managing officer and director of plaintiff, agreed to purchase from said Maple Hill partnership all of its said property for the sum of $30,000, and further fraudulently agreed to procure plaintiff’s release and cancellation of said'contract of May 1, 1902, and thereby relieve said partnership from any and all obligations thereunder, and to enable defendant to control the entire output of said leased premises.
That about July 17, 1902, the defendant fraudulently and without the knowledge or consent of plaintiff, in the name of, and on behalf of plaintiff, pretended to and attempted to release said partnership from any and all obligations undér said contract, and shortly thereafter, in order to cheat and defraud plaintiff of its rights thereunder and to acquire for himself the valuable privileges, and benefits, under said contract, procured to be transferred by said Maple Hill partnership all its right, title and interest in and to said coal property and under said lease, to a corporation procured by defendant to be organized^ *198 known as the Maple Hill Coal Company, of which corporation' the defendant owned $25,000 of the par value of its stock, out of a totai issue of $40,000 par value of stock.
That defendant procured himself to be and was elected one of the directors of said Maple Hill corporation, and by the directors was elected president thereof, and was paid a salary of $5,000 per year from and after its organization up to and including May 23, 1904, upon which last-mentioned date the defendant ceased to be a director and officer of plaintiff and ceased to be its vice-president and treasurer.
That defendant, on the organization of said Maple Hill corporation, entered upon his duties as president thereof, assumed complete control of the samé, managed and directed its affairs, devoting a large part of his time and energy up to and including May 23, 1904; that the business of said Maple Hill Company was in diréct competition with plaintiff in selling coal, and its products were of the same character and sold in the same markets.
That defendant from his long connection with plaintiff as its managing officer and agent had acquired an extensive knowledge of its market for coal, its prices received, and other matters, 'and from such knowledge was enabled to and did divert from the plaintiff a large amount of its business to said Maple Hill Company, to plaintiff’s great damage and to the great profit of said Maple Hill Corporation and to himself, and avers that profits amounting to not less than $110,000 were unlawfully and fraudulently diverted by defendant from plaintiff through the instrumentality of said Maple Hill Company, and appropriated to his own use and behoof, in violation of his duties and trust as an officer and agent of plaintiff, and that from April, 1903, to May 23, 1904, as president of said Maple Hill Company he devoted a large portion of his time and energy to the business of the same, received a salary of $416.66 2-3 per month, managed and controlled its business as a direct competitor and rival of plaintiff and diverted from plaintiff to said Maple Hill Company and to himself a large amount of profits of, and belonging to, plaintiff, amounting, as plaintiff believes, to $25,000.
*199 Plaintiff avers that defendant is accountable to it, and holds in trust for it, .all of said various sums, including something over $9,000 paid to him as salary by said Maple Hill Company from its organization to May 23, 1904.
2. Plaintiff also claims as an additional ground for an accounting that in 1892 the defendant, while acting as a director and officer of plaintiff, procured to be organized a corporation known as the Hocking Coal & Ore Transfer Company, of which defendant was one of the incorporators and stockholders; that its business was to market and sell coal from the Hocking fields in which the mines of plaintiff were and now are situated.
That in September, 1899, the corporate name of said company was changed to the E. T. Affleck Coal Company, under which name it still exists, and carries on its principal business of selling and marketing coal; that defendant from the organization of said Affleck Company had a large interest therein, and still possesses such interest, the amount of which is unknown to plaintiff; that defendant through and by virtue of his connection with plaintiff as director and officer thereof, and by virtue of his control of the management of the business of plaintiff, for many years prior to the dates set out, caused to be sold and delivered by plaintiff to said Affleck Company, corporation, large amounts of coal at prices much less than the average price obtained by plaintiff for its coal sold to other customers, and at prices much less than the average price of plaintiff’s coal, during said period; that -without authority from, or knowledge of, plaintiff, defendant granted special privileges to said Affleck Company, which resulted in a great and undue profit to said Affleck Company, and great loss and damage to plaintiff; that from October 1, 1901, up to and including May 23, 1904, when defendant ceased his connection with plaintiff, defendant sold and delivered to said Affleck Company about 417,000 tons of coal, amounting to about 30 per cent, of plaintiff’s total output, and obtained about 42 cents per ton less than the market value of 'the same.
Plaintiff further alleges that said coal was sold to said Affleck Company without any contract; that the price was inadequate, *200 without authority from plaintiff to sell the same at less than the market price; that said sales by defendant to said Affleck Company was for the sole purpose of enabling said Affleck Company and defendant to gain undue profits therefrom, and was sold in consideration of, and on account of defendant’s interest in said Affleck Company, or on account of some consideration proceeding to defendant from said Affleck Company, of the nature of which plaintiff is ignorant; that by said sales defendant unlawfully and fraudulently deprived plaintiff of its legitimate profits upon said coal, and diverted to said Affleck Company, and to himself, profits which belonged to and were the property of plaintiff; that from October 1, 1901, to and including May 23, 1904, the amount of coal so sold and delivered by defendant to said Affleck Company is, as plaintiff is informed and believes, about 417,000 tons, the market value of which was about $500,000.
That defendant received as profit upon the sale of said coal to said Affleck Company, a large sum of money, the amount of which plaintiff is unable to state, which plaintiff believes is about $175,000, and converted to his own use, and that defendant concealed from plaintiff the fact that he was interested in said Affleck Company, and plaintiff had no knowledge thereof, until about the time of the commencement of this suit.
Plaintiff further avers that by reason of the matters and things set forth in its petition the defendant is indebted to it in a sum, the exact amount is unknown to plaintiff, but which plaintiff avers it believes to be at least $319,277.20; that the same can not be definitely ascertained without the aid of a court of equity, and prays for an accounting by said defendant to plaintiff for all the transactions set forth in its petition, and for the total amount of profits and gains so alleged to have been unlawfully and fraudulently diverted from plaintiff by defendant and appropriated by defendant to his own use, and that de- • fendant may be held to hold the same in trust for the plaintiff, and for all further relief.
The defendant for answer, except that plaintiff is a corporation and has its office and principal place of business in Columbus, denies each and every other allegation of the petition.
*201 The facts established by the evidence necessary here to state are as follows:
The plaintiff was a corporation, and during the times in question had a board of directors consisting of nine members chosen by the stockholders. Plaintiff was engaged in mining and selling coal, operated stores, in connection with its mines; it owned about 13,000 acres of coal land in Athens and Hocking counties, this state, and operated several coal mines there.
The defendant was one of the - directors of plaintiff company during all of said time, except one year, 1895, when said company had a receiver. He was also an officer of said company, and from 1899 was vice-president, and from 1901 was vice-president and treasurer, had charge of selling the product of the company and was practically in charge of the business at Columbus. Mr. Knapp, who resided in New York, was president of the company from some time prior to January,- 1901, and .assumed the duties of general manager. He was succeeded by Mr. Zeigler, who also resided in New York in, January, 1901. These officers, during their respective- incumbency, visited Columbus occasionally for short periods of time to look into the affairs of the company. Defendant fixed the prices mostly at which the company’s coal was sold, and executed .contracts on behalf of the company from about January, 1901, and had supervision of the practical business affairs of said company at Columbus.
In 1895 plaintiff had leased to said Maple Hill partnership about one hundred and' eight acres of coal land contiguous to plaintiff’s mines, with the right for said partnership to mine the coal from said land,' and to pay plaintiff a royalty of ten cents per ton therefor, with a minimum royalty of twenty thousand tons per year, until all the merchantable coal in said tract was mined. Considerable coal remained in said leased land unmined at the time of the grievances complained of. Said Maple Hill partnership owned another tract of coal land adjoining the above of about eighty acres.
Said lease of said coal land by plaintiff to the Maple Hill Company was to the members of said partnership and their assigns, and there was no provision in the lease that would pre *202 vent said lessees from assigning and transferring their interest therein at any time. Said Maple Hill partnership proceeded to and did mine and sell coal from said coal lands;- and in 1899 said partnership entered into a contract in writing with plaintiff company whereby the plaintiff agreed to purchase from said Maple Hill partnership and have the exclusive sale of said partnership’s entire output of coal for the year ending May 1, 1900, to be taken during the year as the trade demanded at stipulated prices for specific grades of coal mentioned. A similar contract, whereby plaintiff agreed to purchase, and said Maple Hill partnership to sell, its entire output was made in writing between them for the year beginning May 1, 1900, and ending May 1, 1901, at prices therein stipulated. Similar yearly contracts continued to be made between said parties and on May 7, 1902, they entered into a contract in writing, whereby plaintiff agreed to purchase and said partnership to sell for the jrear beginning May 1, 1902, and ending April 30, 1903, the entire output of the coal, except slack, mined by said partnership, to be taken during said year as the trade may demand, in an annual amount equal to eighty thousand tons at certain stipulated prices. All of said contracts were signed by defendant as vice-president of plaintiff’s company, and by said Maple Hill Coal Company, by W. T. Bean, secretary.
In said last contract above stated, of date May 7, 1902, below the signature of defendant, as vice-president, was the word, “accepted” and also the words “subject to our sale in .which this contract is void. Maple Hill Coal Co., W. T. Bean, Secy.”
Some time before the expiration of the former yearly con-tract, said Maple Hill partnership expressed a desire to sell its entire'coal property; one of the members of the firm had died; the survivors and representatives of the deceased member wanted to sell. In this connection defendant testifies that some time in 1901, Mr. Bean asked him if he, defendant, would interest himself in selling it for them, and asked him if the plaintiff company would buy it; that he told Bean he would see what he could do, and finally they gave defendant an option on the property to sell it for them for $25,000;- that he did it as a favor to *203 them; that the option ran out about January 1, 1902, and later, along in April, Bean' told him that they were offered $30,000 for the property; defendant says he immediately took it up with Mr. Zeigler, then president of plaintiff company, and asked Zeigler if he would interest himself in buying the property; that Zeigler said he would not; defendant then, certifies:
“I then asked Mr. Bean to give me a few days to think it over as I felt, owing to the litigation that was going on, that I would be out of the Columbus and Hocking Coal & Iron Company myself any day; that the suit — the ouster suit against Zeigler and others — would be decided; that I might be put out, and I wanted to get a piece of property for myself. I went down to P. W. Huntington and he loaned me $20,000, to pay for the. property, and interested Mr. Bloom and Mr. Tress in the transaction, and we purchased the property. ’ ’
The conversation with Bean, in which the negotiations were begun with a view of purchasing by defendant was in April, 1902. In July following defendant wrote to Zeigler,. the president of plaintiff, that he, defendant, and some friends were going to buy the Maple Hill property and asked Zeigler if he wanted to join with them in the purchase, to which Zeigler replied that he did not. Bloom, who joined in the purchase, was also a director in plaintiff company at that time, and. was also acting as agent for plaintiff in selling its coal.
On July 14, 1902, defendant entered into a written contract with said Maple Hill partnership for the purchase and sale of said property in consideration of the sum of $30,000 paid therefor. A company was organized and incorporated as the Maple Hill Company, and began to do business on July 16, 1902. Defendant was a director of said corporation, and was elected its president. A Mr. Bean was made manager, and shortly thereafter the company moved its office to the Wyandotte building, the same building in which plaintiff had its office, three floors above the latter. Mr. Pickering succeeded Mr. Bean as manager, and the latter continued as such until June 1, 1904.
The" company mined from sixty thousand to one hundred thousand or more tons- of coal from said property per year *204 up to the time defendant left plaintiff company in May, 1904.
The Maple Hill Company was incorporated for $50,000 and $40,000 paid in. Defendant subscribed $25,000, Tress $10,000, Bloom $5,000. Defendant subsequently sold $4,000 of his stock; the balance he held and owned during the period in question.
On July 15, 1902, said partnership wrote and sent a letter addressed to defendant, as vice-president of plaintiff company, stating, in substance, that they had sold their mine, and could not load any more coal on plaintiff’s order after said date, and further stating:
“Please acknowledge receipt of this notice and in keeping of our contract please cancel same.”
This was signed by Maple Hill Coal Company, by W. T. Bean, Secretary. On July 17, 1902, the-defendant as vice-president of plaintiff wrote and sent a letter to the Maple Hill Coal Company partnership, in which he acknowledged receipt of their letter of July 15, notifying him of sale of their property, and further stating “in accordance with the provisions of your contract for the sale of coal to this company that the same is canceled. ’ ’
Up to the time of the purchase of said Maple Hill property by defendant the contract between said partnership and plaintiff was being executed by the parties thereto. But from and after said sale, and the cancellation of the contract, the contract was terminated and there was no further execution of it. The output of coal from said partnership property and mines from and after about July 15, 1902, was taken and sold by said Maple Hill corporation, to which said property was transferred by defendant and his associates. Said partnership property was a valuable property, and the operation of said mines and sale of its product was profitable to said Maple Hill -corporation, from the time of its purchase and operation by said company. The said contract between plaintiff and said Maple Hill partnership, which was terminated by said purchase of said property by defendant, had something over nine months yet to run before it would have expired, if said partnership had not sold their said ^property.
*205 During a portion of said time, largely in the fall and early winter, the demand and price of coal advanced very materially, caused by a strike in the anthracite district. This caused a great demand for coal mined in the Hocking district, and the market prices for such coal advanced materially above the normal prices. As a consequence; there was a greater demand on plaintiff for coal than it was able to supply.
So far as the record discloses plaintiff’s board of directors did not have officially brought before it the matter of the cancellation of said contract, and no action was ever taken by said board concerning that matter nor with regard to defendant’s purchase of said Maple Hill property.
So far as knowledge on the part of other officers of plaintiff is concerned of defendant’s purchase of said property, it appears that Mr. Zeigler, the president, first had information in the letter of July 20, 1902, which defendant wrote to him, stating that defendant and some friends were going to buy it, and asking Mr. Zeigler if he desired to take an interest in the matter, to which he replied that he did not. Mr. Bloom, another director, and also sales agent for plaintiff, knew of the purchase, and became an interested party by investing $5,000 in the Maple Hill corporation, to which company the property was transferred. Mr. Addison, another director, also knew of the proposed purchase by defendant. The evidence shows that shortly'after the purchase, Mr. Binns, another director, was informed of the purchase by defendant.
Mr. Binns testifies that defendant stated to him that his reason for purchasing it was, that he did not expect to remain with the plaintiff very much longer, and that he wanted the property for himself. Binns says that was the first information he had of the purchase.
With regard to the sales of coal to the A. T. Affleck Company: This company was organized in September, 1899, and incorporated. The offices of this company were in Toledo. This company was the successor of the Hocking Coal & Ore Company, a corporation, and in September, 1899, the name was changed to the A. T. Affleck Company, and so incorporated. *206 The shares of stock iii the latter company were at first owned by three men, the defendant, E. T. ’Affleck and F. A. Prendergast, each owning one-third of the stock. The defendant’s stock in said company was at no time issued in his name, and his name did not appear at any time on the stock books of the company.
In about one year after its incorporation, the Affleck Company bought Mr. Prendergast’s interest, and the defendant became the real owner of one-half the stock in said company, and he continued to own it until the company was dissolved and ceased business, which was after defendant ceased' his connection with the plaintiff company.
The defendant’s certificate of stock in said company was issued and held in the name of E. T. Affleck. Defendant at no time was either a director or officer of said Affleck Company. The business of the company was that of jobbers in coal, and operated principally in Michigan and Canada. The company handled, defendant says, about 20 per cent, of plaintiff’s entire output of coal. It is conceded that its business in the coal of plaintiff that it handled was profitable, and that one-half or 50 per cent, of its profits were paid to the defendant in the shape of dividends on the stock owned by him in the company.
Defendant says that he assisted said Affleck Company all he could, as they were marketing the coal for plaintiff company, and that it was to the interest of plaintiff that they secure all the tonnage they possibly could, and that he helped the Affleck Company in every way that he possibly could in that territory.
No director or officer of plaintiff company had any knowledge or information that defendant owned any stock in said Affleck Company at any time during defendant’s connection with plaintiff nor during the times here in question. The first sales of coal by defendant as such officer’ of plaintiff to said Affleck Company began shortly after its organization in September, 1899, and the sales continued until said company ceased to do business.
In April, 1899, defendant wrote to Mr. Knapp, president of plainitff, at New York, in which, among other things, he recommended it advisable for plaintiff company to arrange with some Toledo jobber for handling plaintiff’s coal through Michigan, *207 or to make a contract with a good jobber at that point for a fixed tonnage, and recommended a Mr. Copelin at Toledo as a fit man, and stated that he would like to talk the matter over with him, Knapp, before going too far with negotiations of this character. Defendant testifies that in August or September, 1899, Affleck discussed with him and Mr. Knapp the matter of the agency, the details of which were left to defendant to complete with Affleck.
On December 19, 1900, a contract in writing was entered into, signed by defendant on behalf of plaintiff, and by E. T. Affleck on behalf of the Affleck Coal Company. By the terms of this contract said Affleck Company were appointed exclusive agents for plaintiff for the sale of plaintiff’s coal in Michigan and Canada for the term of five- years from January 1, 1901, based on stipulated prices f. o. b. cars at mines, and provided that should the market conditions at any time make it impossible for the Affleck Company to handle plaintiff’s coal on this basis, plaintiff to adjust the prices to the párties’ mutual satisfaction. Then follows the prices stipulated.
Mr. Knapp in his testimony denies that he ever saw the contract, and says he would not have signed a contract extending over that period.
Mr. Zeigler, who succeeded Mr. Knapp as president, says the contract is in line with the policy which he adopts. He became president in 1901, after the contract was made. He says he discussed it after he came in with the company’s attorney, as the price of coal which had for a year been stationary, had arisen considerably in price on account of a strike, and he consulted to know whether the company could, under the contract, advance the price on sales to the Affleck Company; that he gave the companj instructions to raise the prices, and his understanding was that they were.raised; that he regarded the Affleck Company as agents of the plaintiff; that he considered it a good contract during the first year of his administration.
Mr. Zeigler testifies that he did not know that defendant had any interest in the Affleck Company; that if he had known that fact when he was president, it would have affected him in connection with plaintiff’s sale of coal to the Affleck Company.
*208 The evidence shows some correspondence in April, 1903, between defendant, as vice-president, and the Affleck Company, in which defendant writes that owing to the general conditions of the trade and the higher prices at which coal is being sold, and higher mining rates, it is nothing more than fair that the Affleck Company accept a still further advance over the contract price, and proposed stipulated prices.
Also, a letter from the Affleck Company, in which is stated:
“It seems to me inasmuch as we had a contract with you which guaranteed us coal at $1.05 for lump, etc., and for the last two years we have been paying you $1.15 for lump, and now you want to raise it 20 cents per ton higher, I think it is a little too much of a raise. However, we are willing to do what is fair and think you should make the price of lump coal to us at $1.30, steam lump $1.20, run of mine $1.05, nut coal $1, steam nut 85 cents, nut pea and slack five cents, coarse slack 30 cents.”
After defendant ceased to be connected with plaintiff company in May, 1904, no demand was made by the Affleck Company to plaintiff to furnish coal under said contract, although it had about one year yet to run.
I have already taken too much space in stating the facts established for the purpose of the decision. Any other or further facts that may be necessary to state will be embodied in the discussion of the law of the case. The questions here for determination, under the pleadings and the evidence, are:
1. Did defendant, under the circumstances of this case, have the lawful right to terminate the contract of May 1, 1902, between plaintiff and the Maple Hill partnership, by purchasing for himself said Maple Hill property, and thereby appropriate to himself and associates the profits from the output of coal from said property for the remainder of the term of said contract, without accounting for the profits made by him to plaintiff from said transactions?
2. Did defendant have the lawful right to sell coal of plaintiff company to said Affleck Coal Company, whereby the profits made by said Affleck Company from such sales, could in part be realized by defendant individually, by reason of his owning *209 one-half the stock in said Affleck Company, which fact was not known by plaintiff, or any of its directors, officers or agents, other than defendant, without accounting to plaintiff for his own profits from such sales that came to him in the shape of dividends from said purchasing corporation?
3. The third question is, whether defendant is liable to account to plaintiff for his salary paid him by the Maple Hill Company, during the time defendant ivas connected with, and.employed by, plaintiff company?
As to the said Maple Hill transaction, I think there is no doubt but that the issue here made is as to the right of defendant to terminate said contract by his act of purchasing said partnership property, and the right of plaintiff to require him to account to it for whatever profits he derived by reason thereof for the remainder of the term-of said contract.
There is no question here as to the right of said Maple Hill partnership to sell said property, and there could be none, for there is nothing in said lease of 1895 to preclude it from selling its lease at any time, if it so chose. Nor is there any question here as to the right of defendant himself becoming the purchaser of said Maple Hill property, if it was not for the fact of the existence of said contract of 1902, between plaintiff and said partnership, whereby the latter contracted to sell to, and plaintiff contracted to purchase from, said partnership its coal output for the year ending April 30, 1903, conditioned on the part of said partnership of the sale of its property, in which event the contract was to terminate.
- The sale of its property by said partnership ended said contract according to said provision to that effect. So long as said partnership did not sell, it was under obligations to fulfill its part of said contract to sell its output of coal'to the plaintiff for the.remainder of said year specified in the contract. Had the defendant as a director and officer of the plaintiff company the right to become the purchaser and thereby terminate a valuable contract of his company, or was it his duty, as such.officer and agent- of the plaintiff, to hold on to .said contract for his company so long as said partnership did -not sell to some one who was a stranger to plaintiff company ? . .
*210 A great may authorities have been cited on both sides of this case that seem to me to have very little if any bearing on the real issues here made. This, it will be observed, is not a ease in which the board of directors of one corporation, who are also in whole or in part the board of directors of another corporation, make and enter into a contract for the purchase or sale of corporate property. Nor is it a case in which a director and officer of a corporation enters into a contract with his corporation for the purchase of corporate property. The plaintiff corporation here was not a party to the sale of said property, or the cancellation of said contract. It was a contract between defendant and the Maple Hill Company for the purchase of the latter’s entire coal property, and there ivas no action taken by the board of directors or the stockholders of plaintiff concerning the release of said contract. Such was not even proposed or suggested to them officially. So -that many cases 'cited in which boards of directors mutually interested deal with each other, or corporations deal with their own officers and directors, do not present a case such as we have here.
The ease here presented is one in which it is charged that defendant, as such director and officer, while acting in his fiduciary character, deals with himself without the knowledge or consent of the corporation, his beneficiary.
Much has been said in argument as to whether or not a director and officer of a corporation is a trustee for the stockholders of the corporation.
I am of the opinion that, upon the great weight of the authorities, this relation does exist • between the directors and officers of a corporation and its creditors and stockholders. It is so held in Goodin v. Canal Co., 18 Ohio St., 169, and also in United States Roll. Stock Co. v. Railway, 34 Ohio St., 450, 460.
The former case, on page 182, cites with approval 2 Story, Equity, 1252, to the effect that-—
' “It is * * * well settled that the property of a corporation is a trust fund in the hands of its directors for the benefit of its creditors and stockholders. ’ ’
In the latter case, which was a case applicable to corporations, the court say:
*211 “The rule that an agent or trustee in matters touching his agency, or pertaining to the trust, can not bind the principal, or cestid quo trust, without his consent, by a contract in which the former adversely interested, rests upon a very .satisfactory foundation, and is supported by a great weight of authority.”
The court then quotes with approval, Story, Agency, Section 210, that—
“The principal bargains, in the employment, for the exercise of the disinterested skill, diligence, and zeal of the agent for his own exclusive benefit. It is á confidence necessarily reposed in the agent, that he will act with a sole regard to the interest of his principal as far as he .lawfully may. ’ ’
The court also quotes from 2 Kent’s Commentaries, 618, that—
“An agent, acting as such, can not take upon himself, at the same time, an incompatible duty, tie can not have an adverse interest or employment.' lie can not be both buyer and seller; for this would expose his fiduciary trust to abuse and fraud.”
Pomeroy, in his work on Equity Jurisprudence, treats of the subject of trusts in all its forms and classifies the directors and' officers as trustees and the stockholders as cestui que irusteni. Under the classifications with which we have to deal’ under the facts and circumstances of this case, he states what, in my opinion, is the law that is supported by the great weight of authority in this country. He says at Section 958:
“When the trustee deals with the trust property, but not directly with the cestid que trust, and without the latter’s intervention, the rule is inflexibly established that where, in the management and performance of the trust, trust property of any description, real or personal propertj'-, or merchantile assets is sold,- the trustee can not, without the knowledge and consent of the- cestui que trust, directly or indirectly become the’ purchaser. Such a purchase is always voidable- and will be set aside on behalf of the beneficiary unless- he has affirmed it, being sui juris, after obtaining full knowledge of all the facts.
“It is entirely immaterial to the existence of this rule that the sale-is intrinsically a fair one, that no undue advantage is obtained, or that a full consideration is paid, or even that the *212 price is the highest which could be obtained. The policy of equity is to remove every possible temptation from the trustee.”
In Section 959, this author says:
“Nor is an agent employed to purchase or sell, or in any other business, permitted to make profits for himself in the transaction, unless by plain consent of his employer for all such profits wrongfully made he must account to his principal.”
In Section 1075, he says:
“The trustee is not permitted to manage the affairs of the trust, or to deal with the trust property, so as to gain an advantage, directly or indirectly, for himself, beyond his lawful compensation.”
In Section 1094, this author further says:
“Where the directors or officers, or some of them * * * fraudulently misappropriate the corporate property in any manner, whether for their own benefit or for the benefit of third persons, or obtain any undue advantage, benefit, or profit for themselves by contract, purchase, sale, or other dealings under color of their official functions; * ® * or in any other similar manner commit a breach of their fiduciary obligations towards the corporation, so that it sustains an injury or loss, and a liability devolves upon themselves — then the corporation is the party which must, as the plaintiff, brings an equitable suit for relief against the wrongdoers; the trust relations between itself as the cestui que trust and the defaulting directors or officers as trustees has been violated, and as in all like cases the cestui que tnost is primarily the only party to sue for redress. ’ ’
It is claimed in argument that the above rules do not apply in the case at bar because the defendant did not purchase any property of the plaintiff; that the contract in question was one that by its terms would end as soon as said partnership 'sold its property, and as the partnership had an offer to sell, and was going to sell to some third party, that the defendant by purchasing himself did not deprive plaintiff of its rights under said contract, as the obligations under the contract of said partnership would have terminated the contract by its sale to some other *213 party; and that, therefore, the plaintiff sustained no loss by defendant’s purchase and termination of the contract.
The fact as to whether or not said partnership would have found a purchaser, if defendant had not purchased, rests upon the statement alone of Bean, secretary of said Maple Hill partnership, to defendant when he was negotiating with defendant to purchase, that he had an offer from another party, so that it is entirely problematical whether, if defendant had not purchased, said partnership could or could not in fact have consummated and effected a sale before the expiration of said contract. So long as they did not sell, the plaintiff was entitled to the coal under said contract, and said partnership was obliged to comply with their contract to plaintiff. The longer the partnership was deterred from effecting a sale, the longer plaintiff would have derived the benefits under'the contract; consequently it-was to the interests of the plaintiff company that the sale by the partnership of its said property be deferred as .long as possible during the life of said contract. And the best interests of plaintiff would have been subserved by its officers and agents discouraging a sale by said partnership.
The circuit court of appeals of Colorado in McCourt v. Singers-Bigger, 145 Fed. Rep., 103, held that:
“A tenant under a lease, while having no absolute right to a renewal as against the landlord, in the absence of provision therefor, has a reasonable expectancy of renewal which is regarded in equity as property, and, if one standing in a fiduciary relation to him secures a renewal to himself, a court of equity will treat him as hoi ding the new lease in trust for the original lessee.”
The plaintiff, while it would not by the terms of said contract have the right to the enforcement of said contract, and to derive the benefits thereunder in the event of a sale by said partnership, did have the right to its enforcement and the benefits thereunder, so long as said party did not sell said property; and it had the right to expect that said party would not sell during the year of said contract, and, without the consent of the plaintiff; an officer and agent in charge of plaintiff’s'business could not, by-becoming the purchaser, deprive the plaintiff of this right and *214 expectancy, by terminating the contract, and talcing to himself the profits from the output of coal that otherwise would have belonged to plaintiff and which profits would have been for the benefit of the plaintiff corporation.
• It is also claimed in argument that defendant did not deal with himself in selling said coal to the Affleck Company, and that he sold it upon a written contract between plaintiff company and the Affleck Company.
I might say in this connection that, so far as the real issue and question here is concerned, it does not matter whether said coal was sold to the Affleck Company upon contract or otherwise. The action is not one to rescind the contract, and hence the question of the statute of limitations does not apply. Does the fact that defendant was neither an officer nor director in said Affleck Company — it being a corporation, with a board of directors and a managing agent, but the defendant being the owner of one-half of its capital stock, and he, acting for the plaintiff company, as a director and officer thereof, selling said coal of plaintiff's to said Affleck Company, the result of which was, that one-half the profits derived on said coal by said Affleck Company was paid to defendant in the shape of dividends on his stock holdings in said Affleck Company — bring this case within the rule above quoted ?
If it can be said that, technically the defendant did not sell said coal to himself, inasmuch as he was not ah officer of said Affleck Company and consequently had no power or authority to act for or make contracts on behalf of said Affleck Company, it will be observed that the rule is so broad in its scope that it extends, as Pomeroy states as above quoted, “Where directors or officers, or some of them, cause a loss of corporate property * * * or fraudulently misappropriate the corporate property in any manner, whether for their own benefit or for the benefit of third persons; or obtain any undue advantage, benefit or profit for themselves by contract, purchase, sale, or other dealings under color of their official functions,” etc.
So in Goodin v. Canal Co., supra, where the court say, page 182:
*215 “There was not only such a gross inadequacy of price as to shock the moral sense, but there was, in effect, a sale by a trustee to himself, or to his own use and benefit.”
Pomeroy further says at Section 1075:
“It is equally imperative upon the trustee,' in his dealings with trust property, not to use it in his private business; not to make any incidental profits for himself in its management, and not to acquire any pecuniary gains from his fiduciary position. ’ ’
So that the rule is, the trustee can not, without the knowledge and consent of the cestui que trust, directly or indirectly become the purchaser, and he could not in any manner under such circumstances derive any benefit or profit for himself by contract, purchase or sale, or other dealings with the corporate property under color of his fiduciary functions. And whatever profits he derives to himself under such circumstances are, under the rules of law, the profits of the cestui que trust. ®
It is claimed on the part of defendant that the plaintiff corporation has ratified the above transactions of defendant, by a resolution adopted by the stockholders at a meeting held subsequent thereto; that Mr. Ziegler, the president, who held proxies and voted at said meeting 59,033 shares of the capital stock out of an issue of 69,000 shares, had knowledge of the Affleck contract, its terms and provisions, and of the Maple Iiill transaction, and voted said stock-in favor of said resolution of ratification.
The resolution referred to which is in evidence was .adopted at a stockholders’ meeting held on May 20, 1903. Said resolution generally approves, ratifies and confirms all the official acts and conduct of said board of directors and also of W. II. Zeigler, president, and of S. A. McManigal, vice-president and treasurer of said company, and A. T. DeVinnish, secretary, and it further ratified, approved and confirmed all the acts, transactions and official conduct of every kind of. all of the said officers acting for, and on behalf of, plaintiff company.
The resolution does not specify nor refer to either the said Maple Iiill transaction, nor to the sales of coal by defendant *216 to the Affleck Company, nor does it specify any other official acts or transactions of defendant or other officers or agents of the plaintiff corporation.
Aside from the objection that the resolution does not specify the Maple Iiill transaction or the sale of said coal to the Affleck Company, the evidence shows that the stockholders were not in full possession of all the facts concerning said transactions when said resolution was adopted.
Goodin v. Canal Co., supra, page 182, illustrates the rule with regard to a ratification or acquiescence by a corporation.
In that case the court held that the canal company was estopped from claiming the land in question, and refused to enjoin its use by the railroad company, -because the stockholders stood by without objection and observed the railroad expend large sums of money in constructing its roadway, but held that upon the question of compensation the case stands upon a very different basis, that — ■ @
“If it was desired or intended to make such a purchase of the property as would bind the stockholders and creditors of the canal .company, all of them should have either been consulted or bought out.”
So that there are many classes of transactions by directors and officers of a corporation performed without authority, or acts ultra vires, that may be ratified by the board of directors or by a majority of the stockholders. But as to the question of the power of a director or officer of a corporation, or the entire board intentionally to appropriate the property of the corporation to themselves, or any part thereof, such act can not be done short of the consent or acquiescence of all the cestuis que trust eni, which includes all the stockholders. This is the rule stated in Goodin v. Canal Co., supra, and by the authorities generally.
The court, in Goodin v. Canal Co., page 183, says:
“He (the director) is trustee for the company, and whenever he acts ágainst the interests — no matter how much he thereby benefits foreign interests of the individual stockholders, or how many of the individual stockholders act with him — he is guilty of a breach of trust, and a court of equity will set his acts aside *217 at tbe instance of tbe stockholders or creditors who are damnified thereby. Any act of the directors by which they intentionally diminish the value of' the stock or property of the company is a breach of trust, for which any of the stockholders or creditors may justly complain, although all the other stockholders and creditors are benefited, in some' other way, more than they are injured as such. ’ ’
I am therefore of the opinion, that there was no such ratification of said transactions either by said resolution, or from knowledge on the part of the directors, that will operate to relieve the same against the rules of law which govern this ease.
As to the claim of plaintiff that defendant should be required to account to it for the salary from July, 1902, to May 17, 1903, by the Maple Hill corporation, for salary paid to him by said company for services as its president, I have reached the conclusion, that under the evidence, this contention of the plaintiff can not be maintained. While it is true that defendant was at said time paid a large salary by plaintiff, and he was in practical charge of its business ,and sales of its product, and as such officer, plaintiff had the right to require him to engage his time, experience and ability in its service, and while it is true that said Maple Hill corporation was in a sense a competing company with plaintiff, in the same class of coal, and the same territory, yet, so far as the evidence discloses, I am not able to reach the conclusion that defendant gave such time and attention to said Maple Hill Company as materially conflicted with duties to plaintiff at said time. The salary paid to him did not, of course, come from plaintiff, and while the propriety of so engaging himself at said time and under such circumstances, in a competing company, may be seriously questioned, I can not reach the conclusion that under the evidence, and in the absence of a requirement under the terms of his employment and of the by-laws of plaintiff’s company, for his exclusive employment by plaintiff, that he should be required to account for said, salary.
I have not, of course, gone into any question of the amount of profits that defendant derived from said Maple Hill transaction, nor from said sales to said Affleck Company, for that question was not submitted to the court on this hearing.
Outhwaite, Linn & Thurman and D. N. Postlewala, for plaintiff.
Addison, Sinks & Babcock, contra,.
Sufficient evidence was adduced to show that defendant did realize profits for himself in both said transactions, and the amount thereof, great or little, would have to be determined by subsequent proceedings.
My conclusion, therefore, is, that the plaintiff is entitled to an accounting from the defendant for the profits realized by him from the coal contracted under said contract of May 7, 1902, between plaintiff and the Maple Hill partnership, during the full term of said contract ending on April 30, 1903.
That plaintiff is also entitled to an accounting from defendant for the profits realized by him by reason of his ownership of one-half of the stock of said Affleck Company from said transactions between plaintiff and said Affleck Company, for coal sold to the latter by defendant, as such officer, covering the period of time that said sales began to said Affleck Company, to the time that defendant ceased to be an officer and director in plaintiff’s company.
A decree for plaintiff in accordance with the above finding as to'said Maple Hill transaction and as to said sales to said Affleck Company will be entered. A decree for defendant will be entered as to the transaction of said salary paid to him by the Maple Hill corporation.